## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: | ) |
| | ) |
| **DAVID EARL BROWN & DARLA BROWN,** | ) **Case No. 12-50853-can7** |
| | ) |
| Debtors. | ) |
| _____ | ) |
| | ) |
| **BRUCE E. STRAUSS, TRUSTEE,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **Adv. No. 13-5014** |
| | ) |
| **DAVID EARL BROWN,** | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

## MEMORANDUM OPINION DENYING THE DISCHARGE OF DAVID EARL BROWN

The Court held a trial on April 27, 2015, on the complaint of Bruce E. Strauss, Chapter 7 Trustee, to deny the discharge of Debtor/Defendant, David Earl Brown, pursuant to 11 U.S.C. §§ 727(a)(2)(A), (a)(2)(B), (a)(3), (a)(4)(A), (a)(4)(D), (a)(5) and (a)(7). After the conclusion of the evidence, the Court took the matter under advisement, primarily to have sufficient time to review Exhibits 33 and 34 (both deposition transcripts) that were admitted by agreement but not in sufficient time for the Court to review them before the conclusion of the evidence. Having heard the testimony, reviewed the exhibits, listened to the opening statements and closing arguments of counsel, the Court is prepared to rule. For the reasons set forth below, the Court finds that the Trustee has met his burden of proof with respect to several of the counts, and that the discharge of David Earl Brown should be denied.

1

*Jurisdiction*

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(a), and there is no dispute that this is a core matter under 28 U.S.C. § 157(b)(2)(J). Venue is proper, and although this is a St. Joseph Division case, the parties agreed to try the matter in Kansas City.

*Findings of Fact*

***History of the Browns' Chapter 13 Filing – Schedules, Statements & Plan***

Mr. Brown is a so-called "dirt man," who operated an excavation business in Chillicothe, Missouri. Before being involved in excavation, Mr. Brown owned a transmission repair or service shop for many years. He and his wife filed a Chapter 13 petition in the Western District of Missouri, Case No. 12-50094, on February 10, 2012. The bankruptcy was apparently filed to stop collection activities of the Chillicothe State Bank (the "Bank"), after Mr. Brown suffered a slow-down in his construction-related business due to the economy.

Mr. and Mrs. Brown's Schedule A of real property listed two pieces of real estate, a marital home in Chillicothe, valued at $85,000, and a shop building valued at $40,000. The Schedule D disclosed that the home was encumbered by a first deed of trust in favor of Midland Mortgage in the amount of $29,245, and a second deed of trust in favor of Mr. Brown's sister, Alice Elliott, in the amount of $25,000. After the Browns deducted their $15,000 Missouri homestead exemption, the home appeared to still have nonexempt equity of almost $16,000.[1] The shop building was encumbered by a deed of trust in favor of the Bank of approximately $39,000, such that there was effectively no equity in that building.

In addition to personal property of minimal value (bank accounts, jewelry, guns, clothing), the Browns' Schedule B itemized exempt household goods and furnishings valued in

---

[1]     The true amount of the balance owed to Alice Elliott, and the resulting lack of equity, will be discussed below.

aggregate at $2,250; six vehicles, including two dump trucks used in Mr. Brown's construction business; a boat valued at $250; and "business machinery and equipment" valued at $149,500. The Schedule B stated that a list of business machinery and equipment was attached, but no such list was attached to the schedules.[2] The Schedule D disclosed that the two dump trucks, another truck, as well as the $149,500 of business machinery and equipment all secured a second loan to the Bank of $207,000.

The Schedule I of income stated that Mr. Brown had $8,166 in business income; in addition to his wife's wage and other income, the Browns' combined average monthly income was $10,142.38. After deducting living expenses of $10,079.41, including $8,200 of "business expenses," the Schedule J revealed monthly net income of a mere $62.97. The Schedules were verified (signed under penalty of perjury) by both Mr. and Mrs. Brown.

The Browns' Chapter 13 plan proposed paying $100 per month, out of which the Bank was to receive an equal monthly amount ("EMA") of $40.00 on account of the loan secured by the business equipment and trucks. With respect to the shop building, the plan proposed paying the Bank the monthly payment of $316.00 through the plan[3]; the monthly mortgage payments to Midland Mortgage of $583.94 and to Alice Elliott of $350.00 on the marital home, on the other hand, were proposed to be paid directly.

***Chapter 13 Procedural History***

---

[2]      Any failure to attach the list has not been made a part of the Trustee's allegations.

[3]      No evidence was presented concerning the fact that the $100.00 monthly plan payment was obviously insufficient if it was intended that the Bank be paid its $316.00 deed of trust payment out of the plan payment.

A review of the docket sheet reveals that the Chapter 13 case was as troubled as it was short-lived. The Browns did not appear at the first § 341 meeting date set for March 6, 2012, compelling the Chapter 13 Trustee, Richard Fink, to continue the hearing until April 3, 2012, and to request the Court issue an order to show cause for the Browns' failure to appear.[4] The failure of the Browns' plan to propose a payment sufficient to pay the Bank's secured claim prompted the Bank to file an objection to confirmation, as well as a motion for relief from stay and request for Rule 2004 examination. The Chapter 13 Trustee in turn filed a motion to deny confirmation, noting among other issues, that the schedules were incomplete. Specifically, the Chapter 13 Trustee noted that there were multiple items of collateral listed on the Bank's filed proofs of claim, many of which were not listed in the schedules. The Chapter 13 Trustee filed a response to the Bank's stay relief motion, noting that he had no funds on hand, and also filed a motion to dismiss for failure to commence plan payments under 11 U.S.C. § 1326(a)(1) (although the motion was later withdrawn).

***Testimony at the Chapter 13 § 341 Meeting***

The Browns did appear at the continued § 341 hearing on April 3, 2012, and a transcript[5] from that hearing was admitted into evidence. At that hearing, the Chapter 13 Trustee, Richard Fink, asked the Browns if they had reviewed the petition, plans, schedules, and statements of financial affairs before they had signed them, and both Mr. and Mrs. Brown answered "yes." Mr. Fink then asked Mr. Brown: "Were they accurate to the best of your knowledge and belief?" and

---

[4]     No evidence was presented as to why the Browns failed to appear and the failure to appear is not part of the allegations in the complaint.

[5]     The transcript was not transcribed or certified by an officer, and nowhere on the transcript is it reflected that the Browns were sworn in by the Trustee; the Court assumes that someone typed a record of what he or she heard on the tape of the 341 meeting. No party objected to the admission of the transcript, however. The Court also notes that the Trustee has no funds in the estate.

4

Mr. Brown responded: "The best I can tell." Mr. Fink followed by asking Mr. Brown if he was aware of any errors in the bankruptcy papers, and Mr. Brown answered: "Nothing that I can think of."

Later in the hearing, however, Mr. Fink asked Mr. Brown if anyone owed him any money; Mr. Brown answered that the federal government indeed owed him about $13,000.  Mr. Fink then advised Mr. Brown: "So, then you will need to amend the Schedule B" and asked: "What is the likelihood that you will be able to collect?" Mr. Brown replied that "[w]e've been fighting for a year and a half. I would say it's probably not very good that we will get the full $13,000." Mr. Fink then reiterated: "You all need to get the information to your attorney so that your schedules can be amended and you keep her [the attorney, Christine Stallings] into the loop…"

Mr. Fink then gave Robert Cowherd, the attorney for the Bank, the opportunity to examine the Browns. Mr. Cowherd specifically questioned Mr. Brown about the loan from his sister, Alice Elliott. Mr. Brown testified that he had actually borrowed $25,000 from his sister, and that the terms of the loan were to be a "monthly payback." Mr. Cowherd then asked: "And did you make payments to her?" Mr. Brown responded: "Yes. How much I honestly don't know. We would have to go back and dig up the ancient records to find out." In response to Mr. Cowherd's question about whether Mr. Brown had made any payments to his sister in the last year, Mr. Brown said "No."[6]  Mr. Cowherd also questioned the balance of the loan as shown on the Schedule D, inquiring: "What is the balance that you show in your schedules? Is that the current balance including interest?" Mr. Brown replied: "Actually it would be more interest on top of that…"

---

[6]      Exhibit C established that Mr. Brown had actually paid his sister $500 within the year before filing, on Oct. 1, 2011.

Mr. Cowherd then turned to questions about a half-interest in a farm valued at $124,000 that Mr. Brown had disclosed he owned in a financial statement given to the Bank in 2008.[7] Mr. Cowherd asked Mr. Brown directly if he owned any farm real estate, and Mr. Brown answered that he did not. Mr. Cowherd then asked if Mr. Brown had owned farm real estate in 2009. Mr. Brown responded: "At one time my sister and I had an agreement to own some land and it has since fell through because we never got the plan [sic] transferred to me partially because we were not able to pay her on that note." Mr. Cowherd pressed: "In 2009, you listed a half-interest in a real estate farm on the financial statement you provided to the [Bank]…". Mr. Brown responded: "It was my understanding at that time that relations between myself and her were good enough but basically was a matter to doing the paperwork to get it transferred to me."

At that point, Mr. Fink intervened, wanting to know if Alice Elliott had inherited the farmland at issue. Mr. Brown replied that, "No, she bought it." Mr. Fink also pressed: "So she bought it and you were supposed to get half of it?" to which Mr. Brown responded, "Yes." Mr. Fink then asked if Mr. Brown had paid his sister for his half. Mr. Brown replied: "I threw some of the money that she loaned me to pay part of the down payment on it. But you might say gave her back some of the money. No much, I would have to go dig it up." Mr. Cowherd then re-intervened: "So you paid her something?" to which Mr. Brown replied, "Something?" Mr. Cowherd asked: "What is something?" Mr. Brown responded: "Well, I paid her back and she put it down on the farm with the understanding that the farm would be half mine." Both Mr. Fink and Mr. Cowherd then asked in essence about whether Alice had refused to convey the property to him, and Mr. Brown replied: "Yep."

---

[7]     The financial statement at issue, Plaintiff's Exhibit 43, is actually dated January 1, 2008. The Court believes the reference to a 2009 financial statement is a misstatement.

The questioning then turned to how much money Mr. Brown had paid his sister. Mr. Brown testified in response to this question by Mr. Fink: "I would have to dig the paperwork up. I honestly don't know right now. That is way back many years ago." But Mr. Cowherd pressed: "Well, that was in 2009 that you listed a half-interest. That was only two years ago…" Mr. Brown answered, "The payment to her was not in 2009. It was several years before that." This line of questioning continued:

Q [by Mr. Cowherd]:  I understand that, but you listed that you owned a half-interest in it [the farm].

A [by Mr. Brown]:     It was my understanding at that time that I did. We just hadn't got the paperwork done yet.

Q:      So what happened between 2009 and 2012?

A:      To be honest, the [Chillicothe] State Bank pressured me for money and I called her and asked her if she could help me for the money. Since then I have not spoken with her.

Q:      But did she give you any money?

A:      No.

Q:      So you thought you owned it in 2009 …

A:      And since we have not been able to communicate with her…

Q:      But nothing has happened so you potentially have some claim against that property?

A:      I don't see how.

Q:      But you paid her for the property, didn't you?

A:      Well back by month. What she did with the money I cannot say. She may have paid part of the down on the farm or she may not have.

Q:      Well, what I don't understand is why you would list it on the financial statement as a joint half in 2009. Nothing has happened, you said from 2009 to now. But now you say you don't have the half. Why did you own the half in 2009?

A:      It was a misunderstanding.

Q:      It is on your financial statement.

A:      It was my understanding I have since gave your client corrected financial statements since then that the property is not on it. Gary Constant [the bank officer] was made aware of that.

Q:      I understand that.

A:      You are asking me questions that I have already answered to your client.

Q:      I am asking again and keep asking until I get an answer them fully.

A:      You can ask me all you want my answer is not going to change.

After some further questioning about where the farm was located, Mr. Cowherd asked Mr. Brown if he had ever received any income from the farm. Mr. Brown replied: "No. None." Then, turning back to Mr. Brown's payments to his sister, Mr. Cowherd asked Mr. Brown: "And when do you think you paid her some money?" Mr. Brown responded: "It would have been back earlier in 2000s. I would have to get the paperwork out to see." The following colloquy then occurred:

Q:      But you would have paperwork on it?

A:      I would have a cancelled check. Not where I paid on the property but what I paid to her.

Q:      On the loan?

A:      From the money on the loan.

Q [By Mr. Fink]: If I understand, just so I understand, sorry to interrupt. In your mind at the time you told Mr. Cowherd's client that you had an ownership interest in this farm, the money that you considered to get a down payment wasn't a down payment on that farm but was actually just a repayment on this loan that she reported that she lent you $25,000, August of 2001? Is that right?

A:      Would you rephrase that? Cuz I didn't understand it.

Q [By Mr. Fink]: Well, if I understood you correctly, the money that you thought you had used as a down payment on the farm was really not a payment on the farm but was – you were just making monthly payments to her on the note that you had executed with her in August of 2001?

A:      We had paid her back on the note with the understanding that someday when that note was paid off, we might have part of that farm. Or have control of that farm.

Q [by Mr. Cowherd]: Is that in writing?

A:      No.

Q [By Mr. Fink]: And, if I understand you correctly, your [Chapter 13] plan suggested that your payment to her is current but it sounds like you haven't made a payment to her in years. Is that correct?

A:      It's been quite some time since we have. I need to talk to her but so far …

Q [By Mr. Fink]: As far as your bankruptcy where your plan is concerned, it's erroneous when it says your payments on the note to your sister on the supplement [sic] of the loan is current at the time you filed this case, correct? You haven't paid monthly payments, correct?

A:      Yes.

Q:      So for that statement to have been true… that would have meant that all the payments that you should have made between 2001 and whatever month you filed this case have been paid and that's not correct?

A:      How long … how many, I don't know.

Q:      When is the last time you made a payment?

A:      It's been quite a while.

A [By Mrs. Brown]: I have no idea.

Q:      Just an educated guess.

A:      Well, part of that money that we paid her back was payment.

Q:      Okay, well you need to get that fixed so that it's accurate.

Shortly thereafter, Mr. Fink concluded the § 341 meeting.

***Proceedings on the Bank's Motion to Lift Stay***

Three days after the § 341 meeting concluded, or on April 12, 2012, the Bankruptcy Judge[8] held a hearing on the Bank's stay relief motion. The Court granted the Bank partial relief on the equipment and machinery, but stayed its order for 60 days to allow Mr. Brown to sell the collateral and turnover the proceeds to the Bank. The Court set another date for a hearing to lift the stay as against the shop building. The Court also sustained the Trustee's motion to deny confirmation, and ordered the Browns to file another plan by June 15, 2012.

Five weeks after the Court lifted the stay, on May 18, 2012, the Bank filed a motion to prohibit use of cash collateral or lift the remaining stay immediately, and a motion to convert the case to a Chapter 7. The Bank recited that, although the Court had stayed the effective date of the stay relief order to allow Mr. Brown to sell the collateral, Mr. Brown in the meantime had not

---

[8]      The Honorable Jerry W. Venters, now retired.

filed a motion to sell or made any other efforts to sell the collateral, and was using the collateral without paying adequate protection. The Bank subsequently amended the motion to convert to request, in the alternative, that the case be dismissed with prejudice.

The Court entered an order on May 24, 2012, granting the Bank's motion to prohibit use of cash collateral and enjoining Mr. Brown's use of the collateral pending sale, and lifted the stay as to all the collateral, including the shop building. The Court set a hearing on the Bank's motion to convert or dismiss for May 29, 2012. The Court *sua sponte* continued that hearing, however, after Mr. Brown contacted the clerk by phone, stating he would be in surgery on May 29 and that he was seeking new counsel. The hearing was thus reset for June 19, 2012.

### Proceedings to Vacate the Stay Relief Order

In the meantime, new counsel, Joel Pelofsky, entered an appearance for the Browns. Mr. Pelofsky immediately filed a motion to vacate the stay relief order, alleging that the Browns were arranging for a sale as to some equipment but had not completed the arrangements as of May 22, and "were not aware of these deadlines for performance of the orders resulting from the May 22, 2012 hearing." The motion also recited that the Browns' inability to propose a confirmable plan was due in part to communication difficulties with prior counsel. Mr. Brown's notarized signature on the motion acknowledged that the statements in the motion were true. The Court denied the motion to vacate, and set an evidentiary hearing on the Bank's motion to convert or dismiss.

A transcript[9] of the Court's ruling at the evidentiary hearing on June 25, 2012, indicated that the Court considered it a "close call" as to whether to dismiss or convert the Browns' case. Addressing Mr. Brown directly, the Court stated: "It's not an easy decision for me, Mr. Brown…

---

[9]      Again, the "transcript" is not transcribed or certified by an officer, but was admitted into evidence without objection.

and I know it's not one that will make you happy at all… But I think given the circumstances,

maybe a dismissal is best and that'll give you a chance to hang on to your house and see if you

can work something out with other folks. .. I think if I convert the case to a Chapter 7 there's a

chance you lose your house…."

More importantly, the Court referenced testimony (not submitted to this Court) about

unscheduled assets as well as a "disappearing farm interest" in addressing Mr. Brown directly:

> And, you know, I think I am extending you maybe more consideration than is appropriate
> when I hear testimony that several tens of thousands of dollars of tools that are not listed
> on bankruptcy schedules… We have the farm property … that is not explained … The
> farm interest … disappeared from the financial statement in February of 2011 which
> brings it within the statute on fraudulent conveyances in Missouri so there might be some
> explaining to do. …  I know Mr. Brown won't agree or understand perhaps that I might
> be cutting him a break at this point in dismissing the case and not converting it and letting
> Mr. Strauss [the Chapter 7 Trustee][10] start digging around in all of this background. I will
> condition the dismissal, Mr. Cowherd, with prejudice for a period of 90 days – that will
> allow the bank ample time to complete the liquidation of its collateral. .. Mr. Brown, …
> when I was a lawyer in practice I represented a lot of debtors … and I represented a
> number of banks… I came to find out – there comes a time in a banker's life when they
> just don't want to do business with somebody. And, it may be because that somebody is
> difficult or has concealed property or any number of things … [a]nd I think you're at that
> point with Chillicothe [State] Bank. .. The case will be dismissed with prejudice to any
> refiling in any bankruptcy court anywhere for a period of 90 days from this date.

The Court then entered the order denying the Bank's motion to convert and dismissing

the case with prejudice to refiling for 90 days on June 25, 2014. The Chapter 13 Trustee's Final

Report showed the Browns had paid in a total of $400 during the six months their bankruptcy

was pending.

### *Events During the Period Before Refiling*

The Bank scheduled an auction sale of Mr. Brown's personal property and equipment for

September 16, 2012. The day before the sale, the bank officer, Gary Constant, allowed Mr.

Brown to remove personal property items from the shop building, included a motorcycle, three

---

[10]          Mr. Strauss is the panel Trustee assigned to all Chapter 7 cases filed in the St. Joseph Division.

wheelers and a large amount of other items. The value of those items is in dispute, and will be discussed below. In any event, it is undisputed that Mr. Brown asked four or five friends to brings trucks and trailers, and they loaded multiple items of personal property and moved them to a friend's storage facility. The auctioneer testified that the auction was well-attended, and that the remaining items sold for around $184,000 to $185,000.

### Chapter 7 Filing – Schedules and Statements

Mr. and Mrs. Brown filed Chapter 7 on November 26, 2012, some five months after their Chapter 13 had been dismissed. Bruce E. Strauss was duly appointed as Chapter 7 Trustee. The Schedule A of real estate listed the marital home as still worth $85,000, with a first deed of trust in the same amount ($29,245) to Midland Mortgage, but a second to Alice Elliott of $48,000, leaving no nonexempt equity after deduction of the homestead exemption.

The Schedule B reflected the absence of the dump trucks, machinery and equipment that the Bank had repossessed, and included the motorcycle and three-wheeler Mr. Brown retrieved before the auction, both valued at $100 each, but was otherwise essentially the same as the Schedule B in the Chapter 13 (with some minor, irrelevant details). The itemization and valuation of the exempt household goods in the Chapter 7 Schedule B was identical to the list in the Chapter 13; however, the Chapter 7 Schedule B included a contingent, unliquidated claim against the Bank for allegedly selling exempt property and personal records at the auction, valued at $6,000. The statement of financial affairs reflected the foreclosure of the shop building and other collateral, but otherwise disclosed no transfers of any other property. The schedules and statements were verified by Mr. and Mrs. Brown.

### Chapter 7 Procedural History

13

Like the Browns' Chapter 13 case, the Chapter 7 case has been similarly troubled. Two Orders to Show Cause were issued for failures to file the creditor mailing matrix and schedules.[11] The Browns did attend the first § 341 meeting set (more about that later), but the Trustee filed three motions to extend the deadline for objecting to discharge, reciting the need to conduct further investigation, including the need to review documentation Mr. Brown had not yet provided and to complete a Rule 2004 examination. Before the expiration of the third extension, the Trustee timely filed the adversary complaint at issue in this case. In the meantime, however, the Trustee filed a motion to compel turnover of 2012 tax returns, a motion to compel Mr. Brown to answer certain questions to which Mr. Brown had invoked his 5th Amendment privilege, and a motion to compel disclosure of unidentified assets and to amend schedules. The Trustee later withdrew the motion to compel turnover of the tax returns, but the Court entered orders on the other two motions.

First, the Court's January 10, 2014 Order on the motion to compel unidentified assets recited that Mr. Brown with the assistance of friends had taken possession of a significant amount of personal property before the auction sale, and that neither the specific property nor the names and addresses of the friends who had helped moved the property had been provided to the Trustee. In response, the Browns did file an Amended Schedule B on January 16, 2014, adding "Misc. Automotive Books, Signs, Shop Manuals, Typewriter," valued at $50; "Sacks of used clothing" with no value; "Various Shelves & Cabinets, Tables, Chairs," valued at $25; and "Boxes of Used Automotive Parts, See Attached Lists," valued at "more than $50." An eleven-page, handwritten list of miscellaneous items, such as squares, "T and framing," shop rags,

---

[11]        The Orders to Show Cause were admitted into evidence. However, debtors not infrequently file bankruptcy without all required schedules, statements or other documents; § 521 and applicable rules do not require all documents be submitted with the petition. And, the Court received no evidence that the issuance of the show cause orders in this case is somehow evidence of bad faith or other malevolent intent.

blankets, wooden mallets, scanner, utility knife, etc., was attached. An amended Schedule G, filed of even date, added an executory contract with an attorney representing Mr. Brown on a previously unscheduled workers' compensation claim.[12]

The Court in the meantime also entered an Order on the Trustee's Motion to Compel answers; the Court held that Mr. Brown had properly invoked his 5th Amendment privilege in response to questions about the 2009 financial statement and the half-interest in the farm listed in that financial statement, but noted that Mr. Brown could suffer negative consequences from any refusal to explain loss of assets or to cooperate with the Trustee.

### *Chapter 7 § 341 Meeting*

Mr. Strauss in his capacity as Chapter 7 Trustee conducted the examination of the Browns under § 341 on January 4, 2013. A transcript[13] of the hearing was admitted into evidence. After Mr. and Mrs. Brown were sworn in, Mr. Strauss asked if there were any changes or modifications that needed to be made to the schedules; the Browns' counsel interjected that he would be amending to add a workers' compensation claim, a claim against the Bank, as well as to add two small creditors. In response to what the claim against the Bank involved, Mr. Brown testified that it involved numerous items that were in the building when the Bank foreclosed that were never returned. Mr. Strauss asked Mr. Brown to provide, in addition to the amended Schedule B, a narrative report of the details and requested that be done within 15 days. Mr.

---

[12]      The workers' compensation claim, listing dates of injury on April 6, 2012 and November 31, 2011, was scheduled on an amended Schedule B, and claimed exempt on the Amended Schedule C, filed along with the Amended Schedule G; the value per the Schedule C is $125,000, with the notation that "offer of $125,000 for 12/13 not accepted."

[13]      The transcript is not transcribed or certified by an official, but was admitted into evidence without objection.

Brown responded: "I have been compiling it so I got numerous notes, just a few days to compile it."

Mr. Strauss then returned to the litany of standard questions being asked of Mrs. Brown and asked if "other than that, do you believe that your schedules are true and correct?" Mrs. Brown replied "Yes." Mr. Strauss then asked Mr. Brown: "If I asked you the same questions I asked your wife, would your answers be the same …"? Mr. Brown responded: "Yes." After discussing some particulars about the vehicles and the business, Mr. Strauss inquired: "Where in your schedules are, like, the tools and so forth?" Mr. Brown responded: "Well, the bank took them." Mr. Strauss pressed: "So you don't have any tools anymore?" To which Mr. Brown replied: "I can't even change oil in my own pickup."

Mr. Strauss also inquired about the balance of the deed of trust owed to Alice Elliott, asking: "How come her claim is $48,000?" Mr. Brown replied: "Well, as of May, we have not made payments to her for quite some time and the interest has accrued on it." Mr. Strauss again pressed: "You have not made a payment to her since the year 2000?" Mr. Brown said, "No. Since about 2001 or 2 – somewhere in there." In response to Mr. Strauss' question about whether Mr. Brown had maintained a record of how much he had paid his sister, Mr. Brown replied: "At one time we did. We have looked and looked. She has come up with some figures of her own. That was so long ago that I am kind of relying on her now." After that, Mr. Strauss concluded the examination.

### Rule 2004 Examination of Mr. Brown

A transcript[14] of the Rule 2004 examination was admitted into evidence. At the Rule 2004 examination, Mr. Strauss asked Mr. Brown about the $25,000 loan from Alice Elliott and

---

[14]    The transcript is officially transcribed and certified.

specifically asked what Mr. Brown used the loan proceeds for. In response to the question, "What did you do with that money?" Mr. Brown testified: "I did not know at the time that my wife had some pretty severe credit card debt. And when I discovered it things had already gotten pretty well out of hand to the point where I discussed it with Alice and asked if she would loan me the money to get that problem rectified once and for all, and that's what that loan was for." Mr. Strauss followed up: "So you took the $25,000 and paid it on your wife's credit card debt?" Mr. Brown replied: "That was part of her debt, yes." The colloquy continued:

Q [by Mr. Strauss]: What was the other part?

A: [by Mr. Brown] I think her debt totaled around $32,000, somewhere in that range.

Q:     I'm asking you right now just what you did with the $25,000?

A:     Paid it to the credit card companies.

Q:     And that was the only thing you did with it?

A:     Yes.

Mr. Strauss then asked if Mr. Brown had records that would reflect the deposit of the $25,000. Mr. Brown responded: "I'm sure I could find some. That was before electronic, so it's going to be hard copy." Mr. Strauss indicated that hard copy would be fine, and said, "I'd ask that you do see if you can find the deposits for that money."

With respect to payments to Alice Elliott, Mr. Strauss asked Mr. Brown to verify a document marked for the examination as Exhibit 2, purporting to be a loan repayment history. Exhibit 2 is not attached to the Rule 2004 examination transcript, although there is a loan repayment history marked as Defendant's Exhibit C that was admitted by agreement. The Court assumes that Exhibit C is the same as the Exhibit 2. In any event, Mr. Brown testified and Exhibit C reflects that the Browns made only minimal payments to Alice Elliott: $250 in October

17

2003; $200 in October 2004; $200 in October 2006; $250 in October 2008; $375 in April 2010;

and $500 in October 2011. Mr. Brown did not confirm, however, that all of these were cash

payments or that Exhibit 2 reflected all the payments he made; he stated he would have to review

his records and that some of the "payments" may have been credits for work he did on the farm

property. Mr. Strauss concluded his examination upon this particular topic by stating: "Well, I do

want your records that you have gathered for that purpose for which you can't remember what

they say today and I'd like you to provide those documents as well." Mr. Brown responded:

"Okay."

Mr. Strauss then turned to the house and Alice Elliott's note and deed of trust. After

noting that Mr. Brown had still not provided him the note, he asked Mr. Brown about the

$48,000 balance owed to Alice as reflected on the Schedule D. Mr. Brown answered that he had

made a "ball park guess" since he had asked Alice for the actual balance "and it was slow in

coming to me." Mr. Brown admitted that the actual balance as reflected on Exhibit 2 was, at

$58,984.03, "apparently a little more" than the $48,000 as reflected on the Schedule D.  Mr.

Brown contended, however, that he had told his sister that he didn't think her schedule of

payments was correct, prompting Mr. Strauss to ask: "Do you have any documents to contest

what your sister has said?" Mr. Brown responded: "In doing a like-kind exchange some of the

work I did up there for her, no. Some checks I'm sure I could find." Mr. Strauss questioned:

"Haven't you already found those checks with regard to when you did your search?"  To which

Mr. Brown answered: "I found a ledger that I was keeping that I would note in whenever I would

make a payment to her." Mr. Strauss then asked: "So you will be able to get that ledger to me?"

Mr. Brown replied. "Yes."

18

With respect to the farm, Mr. Brown denied he had had an agreement with his sister to own a half-interest in the farm at the inception of its purchase. Rather, he testified that Alice's husband had been interested in acquiring land for hunting in Missouri, and that he, Mr. Brown, had located some real estate, negotiated the purchase price, and arranged through his bank for Alice and her husband to finance the purchase price, a process he described as similar to "brokering." He testified that "I had borrowed a little more money from Alice to help pay off Darla's credit card bills, so Alice was counting on that to be used … for her to either pay down on the farm or to make improvements on the farm, so I paid her a little bit of money that I had [and] [s]he bought the farm."

It was not until several years later, around 2005, Mr. Brown testified, that the topic of loss of his hunting grounds had come up with Alice, and "she had told me then that as far as she was concerned, since I had lost all my other places to hunt she was going to give me one half of that farm … for me to always have a place to hunt, and it really never got done because Alice lives in Mississippi and doesn't come back here very often." Mr. Brown also testified that after he investigated with the U.S.D.A. about enlarging a pond on the property, he and Alice had a falling out, over the fact that enlarging the pond would reduce the CRP income from the property. This trouble with Alice, causing her to not want to convey him an interest in the farm, Mr. Brown testified, had occurred sometime in 2008 (after he had provided the January 1, 2008 financial statement to the Bank).

The examination then turned to the discrepancies in value between items on the January 1, 2008 financial statement and the Chapter 7 Schedule B. The financial statement listed personal property valued at $129,200; Mr. Brown testified that that amount would have been made up of (1) the boat (valued at $1,500 in 2008 vs. $250 in both the Chapter 13 and 7 Schedules in 2012);

(2) the motorcycle (valued at between $1,000 and $1,500 in 2008 and not scheduled in the Chapter 13 Schedules but valued at $100 in the Chapter 7 Schedule B filed in December 2012); and (3) "everything inside the house as far as furniture, odds and ends, some collections of antiques that I had which was in the shop building." Mr. Brown also denied that any of that $129,200 included business equipment, but testified that it included $70,000 to $80,000 in personally-owned antiques that he had collected since he was a teen. Mr. Brown denied having created an inventory or that the items were insured. Mr. Strauss responded: "So, if I do my math that would come out to somewhere between $46,000 worth of remaining down to $36,000 of remaining items. What happened to those?" Mr. Brown responded: "Well, some went to nieces and nephews, but it was odds and ends and small stuff."

Then followed a particularly frustrating exchange spurred by Mr. Strauss' attempts to determine how Mr. Brown had valued the personal property and what property had been included:

Q [by Mr. Strauss]: So, between this statement [January 1, 2008] and when you filed your original bankruptcy with Ms. Stallings, some was given to nephews and nieces, but small stuff. What else?

A [by Mr. Brown]: I don't really recall other than I was always instructed when you make a financial your personal whatever you paid for your chair, desk was always reflected on the financial.

Q:      Okay. So how did you do that calculation?

A:      Pretty much keeping track of items that we owned in the house.

Q:      But you had no inventory list, so how would you be able to put that together on your financial statement?

20

A:      Well, it was pretty easy to walk through the house and remember what we paid for stuff.

Q:      So that's what you suspect you did before you filled out the financial statement?

A:      Yes.

Q:      Can you walk through the house and determine what's not there anymore?

A:      Over the years, probably not. There has been too many – too many days gone by.

Q:      As you sit here what you're telling me is you can't explain what happened to – forget the antiques for a moment, but to the $36 – to $46,000 worth of items which you have no list for, what happened to them between the day you filed this (indicating) [January 1, 2008 financial statement] and the day you filed your original bankruptcy?

A:      If you are asking for specifically what was in the house that we valued, I don't have an inventory of it.

Q:      You haven't told me anything specific or not. You're asking me just to believe that somewhere they went but you don't know where.

A:      Ask the bank because not just the antiques were in that shop building, a lot of personal private stuff.

Q:      Sir, I'm going back to the property that you said was in your house, you walked through your house and that's how you did it. So what happened to those items between the time you did this financial statement and you filed bankruptcy?

A:      What you did not ask and you assumed was that the personal things I was talking about that was in the house was actually in the house.

Q:      But you told me – stop for a minute. … You just told me a minute ago that the way you figured out the value is that you went through the house and looked at them and realized

21

what you paid for them, so you told me they were in the house. So now go back and tell me what happened to the items that were in the house that based on the math that you gave me – I'm accepting your numbers – that weren't there when you filed your Chapter 13 bankruptcy with Ms. Stallings, aside from some small things given to nieces and nephews.

A:      I would have to add that some of the personal items were stored in the shop building.

Q:      Forget those and just go to what was in the house.

A:      You're asking me for a number that I can't give you because without going back through it I can't make that statement. I can't give you a definite answer.

Q:      You are not giving me any answer, sir. You're not telling me whether you had garage sales, whether you sold it on eBay. I'm looking for assets that you under oath stated existed, now those assets aren't there and I'm giving you this opportunity to explain it, other than telling me the [Bank] took assets. ……

A:      Anything of major value is still in my house.

After a break with his counsel, Mr. Brown resumed his testimony about the value of his personal property. When shown the Schedule B from the Chapter 13, Mr. Brown testified that his attorney had determined the value of the household goods, and that although he had questioned her about it, he "was told repeatedly that she wanted to get this filed, that she could always go back and amend the filing." In response, Mr. Strauss queried: "So are you saying that's not the proper value? Mr. Brown: "I didn't think so at the time. What is the proper value I would have to again go back and look at." When asked why he had testified under oath to Mr. Fink at the Chapter 13 § 341 meeting that the schedules were true and correct without saying anything about

the apparent incorrect value, Mr. Brown said: "With the understanding that they would be modified."

Another frustrating exchange occurred:

Q [by Mr. Strauss]: Did you raise your hand and say, Mr. Fink, I understand I can modify these and I'll correct them?

A:      I really think at one point, yes.

Q:      Okay, I have the transcript. I've listened to it. That's your testimony that's what you said to Mr. Fink?

A:      There was mention in there of making a modification to it.

Q:      To the plan, sir. To the plan.

A:      What is the difference? I don't know.

Q:      So what's wrong with that number then? You think it's too low?

A:      That particular number I can't say yes or no right now.

Q:      But you just told me that you said it was wrong.

A:      It looks low to me.

Q:      So you're not satisfied with Ms. Stallings, she put the number down out of the sky. Well, let me ask you about Exhibit 8 [the Schedule B from the Chapter 7].

A:      Again, what is this?

Q:      Why don't you read it, look at it, and then ask.

A [to his attorney]:     What am I looking at?

…

Q:      Mr. Brown, those are a portion of the bankruptcy schedules that you filed in the case in which I am the trustee on November 26, 2012. Once again, you signed them under

penalty of perjury. Let's go to Schedule B. Go down to household goods and furnishings. What

did you list the value of the property at, Mr. Brown?

A:     I believe that was taken off of Christine Stallings' numbers.

Q:     … I'm asking you what is the amount placed on that?

A:     $2,250.

Q:     How much did Ms. Stallings put on in her petition?

A:     I do not know.

Q:     Well, pick it up and look at it. You just looked at it a minute ago and said it was

incorrect.

A:     Let's look at the dates. This was 2/27 of '12 and this is 12 of '12. This is low.

Q:     What number is that?

A:     $2,250.

Q:     And what's the one in the newest schedules?

A:     $2,250.

Q:     Okay.

A:     This one is low; this one is not.

Q:     Why would that be, Mr. Brown?

A:     Didn't have any job. I had to sell some things off to be able to eat.

Q:     So between the filing on 2/27/12 and the filing on 11/2/12 you sold property?

A:     Some odds and ends, yes.

Q:     What did you sell?

A:     I sold a lawn mower, sold a chain saw, a couple chain saws.

Q:     What else?

A:      I'd have to ask the wife 'cause there was odds and ends stuff that we sold off.

Q:      How much did they total in value?

A:      I don't know.

Q:      How can you know that the numbers are different or wrong? How do you know the number is wrong when you don't even know what was sold or what was obtained?

A:      You know, I simply don't know.

Mr. Strauss then directed Mr. Brown to look at his answer to the Statement of Financial Affairs showing that in answer to the question of whether he had transferred any property in the last two years, he had answered "none." Mr. Brown's explanation for answering that he had no transfers was that "[m]y definition of property is real estate."

***The Adversary Proceeding***

The extended deadline for the Trustee to file objections to discharge under § 727 expired on September 13, 2013; the Trustee timely filed his complaint against Mr. Brown on September 11, 2013. The Trustee's Adversary Complaint as amended seeks to deny the discharge of Mr. Brown based on seven separate grounds. With respect to § 727(a)(2)(A), the Trustee alleged that Mr. Brown had transferred and concealed assets within the year before the filing, by selling and gifting the property that he had testified about in his Rule 2004 examination, and by concealing the personal property removed from the shop building before the sale. With respect to § 727(a)(2)(B), the Trustee alleged that Mr. Brown had transferred and concealed assets after the bankruptcy filing. With respect to § 727(a)(3), the Trustee alleged that Mr. Brown had failed to keep or preserve documents regarding his financial condition, specifically the records of payments to Alice Elliott and the records of what happened to the personal property that was sold.

With respect to § 727(a)(4)(A), the Trustee alleged that Mr. Brown had made a false oath or account, by testifying falsely at both 341 meetings that his schedules and statements were correct; by failing to schedule a workers' compensation claim; by knowingly undervaluing his household goods and furnishings in the Chapter 13; by failing to schedule the personal property assets he removed from the shop building in the Chapter 7, and by failing to disclose the sale of household goods between the dismissal of the Chapter 13 and the filing of the Chapter 7.  With respect to § 727(a)(4)(D),  the Trustee alleged that Mr. Brown had withheld books and records from him as an officer of the estate, in particular the record of his deposits of the $25,000 loan proceeds from Alice Elliott, the ledger of his payments to Alice and documents regarding credits for work he had done, and the accounting of the property Mr. Brown had taken from the shop building.

Finally, under § 727(a)(5), the Trustee alleged that Mr. Brown had failed to satisfactorily explain the loss of assets that had been shown on his January 1, 2008 financial statement, namely his interest in the farm and the loss of thousands of dollars of personal property. And, with respect to § 727(a)(7), the Trustee contended that Mr. Brown committed the same acts in his Chapter 13 and in connection with an insider, by stating in his plan that payments to his sister on the second deed of trust were current, and by understating the amount he owed her.

Mr. Brown's answer generally denies the allegations.

***Motions To Continue the Trial Setting***

The trial date was set with the issuance of the summons for December 5, 2013. At a pretrial held on November 12, 2013, the parties represented that discovery was ongoing but had been made difficult on account of Mr. Brown's taking of the 5th Amendment, so the Court cancelled the trial setting and set another status conference for January 7, 2014. That conference

26

was continued to coincide with a hearing in the main case on the Trustee's motion to compel to compel Mr. Brown to answer questions (for a determination that Mr. Brown had improperly invoked the 5th Amendment).

On January 21, 2014, the Court held a status hearing and a hearing on the motion to compel. The Court denied the motion to compel[15] and set another status conference for April 22, 2014, based on the Trustee's indication that he might need to amend to add some additional counts regarding missing assets.

On April 3, 2014, Mr. Brown's current counsel filed a motion to withdraw. In the motion, he recited that Mr. Brown had failed to provide him with documentation about the personal property listed in the financial statement or to assist counsel in the collection of documents and had failed to generally cooperate. Mr. Brown was served with the motion but did not object. Mr. Brown's counsel at the next status conference asked the Court, however, to hold the motion to withdraw in abeyance[16]; he reported that Mr. Brown had received a favorable settlement offer on his workers' compensation claim which he hoped could be used to settle with the Trustee, but that Mr. Brown was refusing to execute the settlement agreement. The Court set the matter for trial for July 22, 2014, with a pretrial conference on June 10, 2014.

On June 10, 2014, the parties reported to the Court that the matter was ready for trial. By agreement, the Trustee filed a second amended complaint to add some additional factual allegations that had already been the topic of discovery and which would not delay the trial. The

---

[15]     The Court's Order is incorporated herein by reference.

[16]     The motion to withdraw is still pending pursuant to counsel's request. The Court would note, however, the counsel for Mr. Brown has done an exemplary job of representing and defending his client under difficult circumstances.

Court granted the Trustee leave to amend, and Mr. Brown timely answered the Trustee's second amended complaint.

On July 16, 2014, Mr. Brown filed a motion to continue the trial. He alleged that he had suffered another work-related back injury in April 2014 and that the psychological distress made him unable to concentrate or prepare for legal matters. The motion was supported by a statement from his physician dated the day before. The Court granted the motion, and set a status hearing for July 29, 2014 to discuss rescheduling the trial.

On July 29, 2014, the Court held a status conference and reopened discovery for the limited purpose of allowing the Trustee to serve requests for admissions based on Mr. Brown's refusal to allow his counsel to stipulate to documents. The Court ordered that discovery be cutoff by September 30, 2014, and set a status conference for October 7, 2014, at which time the Court said it would set a trial date.

On October 7, 2014, the Court held another pretrial conference. Mr. Pelofsky reported that his client was not in good medical condition but did not have specific information. The Court set a trial for December 15, 2014 and ordered witness and exhibit lists to be filed by December 8, 2014.

On December 8, 2014, the Trustee filed his witness and exhibit lists; Mr. Brown did not. Rather, on December 9, 2014, Mr. Brown filed a second motion to continue the trial. The motion was supported by another statement from Mr. Brown's physician, again indicating that Mr. Brown had suffered an acute back injury and was in severe psychological distress, making him unable to fully concentrate on tasks and unable to adequately prepare for his upcoming legal matters. The Court granted the motion to continue, and continued the trial to a date to be determined. Noting that the letters from the physician did not say what Mr. Brown's prognosis

was or when he might be able to prepare, the Court directed Mr. Brown and his counsel to consult with the physician and to report back to the Court, after which the trial would be set and there would be no more continuances.

Mr. Brown filed a "Notice of Compliance" on December 16, 2014 and a medical report under seal. The Court held another status conference on January 27, 2015. The Court stated that it did not agree that Mr. Brown had complied with the Court's Order; the medical report was not current, but was dated June 2014, and the way the doctor had written the report strongly suggested to the Court that Mr. Brown was not injured as seriously as he was proclaiming to be. Since Mr. Brown's next doctor's appointment was purportedly scheduled for February 6, 2015, after which Mr. Brown was to know his course of treatment, the Court scheduled another status conference for February 10, 2015, indicating that the trial date would be set then. The Court further expressly directed Mr. Brown to discuss with his physician when he would be available for trial, what his limitations would be, and to give the doctor authority to speak to Mr. Brown's counsel.

On February 10, 2015, it again appeared to the Court that Mr. Brown was deliberately dragging his feet so as to avoid having a trial set since Mr. Brown had not provided the information requested by the Court; the Court thus set a trial date for April 27, 2015, and a deadline for filing any pretrial motions, including any motions to continue, for March 16, 2015. Mr. Brown did not file any motions by March 16, 2015, but did file his witness and exhibit lists as directed by the Court.

On April 21, 2015, the Court received word that Mr. Brown, acting without benefit of counsel, was attempting to fax-file a motion to continue the hearing. The Court obtained a copy of the purported motion from counsel, and held an emergency hearing. The Court put the motion

under seal since it contained information about Mr. Brown's medical condition. What the motion did not contain, however, was an answer to the Court's earlier questions about Mr. Brown's prognosis; it stated that Mr. Brown had been in the hospital earlier in the month, but had asked the doctor to go home, and that Mr. Brown would not ask his current physician to explain his medical condition for fear of alienating him. The motion reflected a clear ability to concentrate and intelligently articulate his position, contrary to Mr. Brown's allegations about the effect his condition was having on his mental faculties. Under the circumstances, the Court denied the motion, saying that if Mr. Brown needed accommodations, such as access to his breathing machine or frequent breaks, the Court would be more than happy to provide such accommodations.

Finally, in the middle of the trial, Mr. Brown made an oral motion to continue the trial, stating that he was in pain, and that, due to his walking so much, his pain medication had worn off. Although not reminding Mr. Brown that in his letter motion filed under seal he had stated he was not taking any pain medication because it interfered with his other medications, the Court denied the motion. The Court had the opportunity to observe Mr. Brown closely, both sitting and occasionally standing at counsel table and on the stand. Mr. Brown had no trouble answering questions both on direct and cross examination intelligently and articulately; although in some pain, he did not appear confused or unable to answer questions. He followed the testimony of the other witnesses closely and regularly took notes and consulted with his counsel.

The Court incorporates its rulings at all the previous status hearings outlined above as well as the hearing on  April 22, 2015, and reiterates and restates its findings that Mr. Brown did not comply with the Court's Orders to provide evidence of his medical condition; appeared to be dragging his feet to avoid a trial setting; was not prejudiced in having his continuance motions

30

denied, since he was able to fully participate in the presentation of his evidence; and that, conversely, the Trustee had subpoenaed witnesses and prepared for trial, and would have been prejudiced had the Court granted the continuance. *See In re Hopper*, 228 B.R. 216, 17 (B.A.P. 8th Cir. 1999).

Additional findings of fact will be made in connection with the discussion of each § 727 count.

### *Discussion*

Section 727 governs discharges in bankruptcy. A discharge under 11 U.S.C. § 727 relieves a debtor of personal liability on pre-petition discharged debt and effectuates the debtor's fresh start. One of the primary goals in an individual Chapter 7 is to discharge the debt of the honest but unfortunate debtor. This provision provides a procedure by which "certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934). A discharge in bankruptcy is, however, a privilege, not a right. *Grogan v. Garner*, 498 U.S. 279, 286 (1991); *Matter of Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996).

Upon the expiration of the time to object, a bankruptcy court must grant a discharge to a Chapter 7 debtor unless grounds to deny discharge exist. 6 *Collier on Bankruptcy* ¶ 727.01[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); *See* 11 U.S.C. § 727(a); Fed. R. Bankr. P. 4004(c)(1). Denying a discharge is a "harsh and drastic penalty" as it defeats the debtor's purpose in seeking bankruptcy relief. *In re Korte*, 262 B.R. 464, 471 (B.A.P. 8th Cir. 2001). The provisions under § 727 are construed liberally in favor of the debtor and strictly against creditors, but also protect system from abuse by debtors. *See In re Chalasani*, 92 F.3d 1300 (2d. Cir.

1996).  Generally, a discharge is unavailable to debtors who engage in unscrupulous conduct. *Bernau v. Olbur* (*In re Olbur*), 314 B.R. 732, 740 (Bankr. N.D. Ill. 2004).  As one court stated, "complete disclosure is the touchstone in a bankruptcy case." *In re Bernard*, 99 B.R. 563 (Bankr. S.D.N.Y. 1989).

Discharge objections must be brought by adversary proceeding within the time specified in Rule 4004(a). *See* Fed. R. Bankr. P. 7001 & 4004.  The party objecting to discharge must prove each element by a preponderance of the evidence. 6 *Collier on Bankruptcy* ¶ 727.01[2] (16th ed. 2012).  The trustee has standing to object to the debtor's discharge under 11 U.S.C. § 727(c)(1), which states: "[t]he trustee, a creditor, or the United States trustee may object to the granting of a discharge under subsection (a) of this section."

Taking each count in turn:

### 11 U.S.C. § 727(a)(2)(A)

11 U.S.C § 727(a)(2)(A) provides that the court shall grant the debtor a discharge,  unless "[t]he debtor, with intent to hinder, delay or defraud a creditor or an officer of the state charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed -- property of the debtor, within one year before the date of the filing of the petition." To prevail on a § 727(a)(2)(A) complaint, the Trustee must prove each of four elements by a preponderance of the evidence:

(1) The wrongful action occurred within 1 year before the petition filing;

(2) The act was committed by the debtor;

(3) The debtor had actual intent to hinder, delay, or defraud a creditor or officer of the estate; and

(4) The debtor's action consisted of transferring, removing, destroying, or concealing the

debtor's property.

*In re Korte*, 262 B.R. 464 (B.A.P. 8th Cir. 2001).

Actual intent can be inferred from circumstantial evidence, such as the facts and circumstances of the debtor's conduct. *McCormick v. Security State Bank*, 822 F.2d 806, 808 (8th Cir. 1987). Factors considered when determining whether the debtor acted with actual intent include: lack or inadequacy of consideration; family, friendship, or other close relationship between transferor and transferee; retention of possession, benefit or use of property in question; financial condition of the transferor prior to and after the transaction; conveyance of all of debtor's property; secrecy of conveyance; existence of trust or trust relationship; existence or cumulative effect of pattern or series of transactions or course of conduct after pendency or threat of suit;  instrument affecting the transfer suspiciously states it is bona fide; debtor makes voluntary gift to family member; and general chronology of events and transactions under inquiry. *Riley v. Riley* (*In re Riley*), 305 B.R. 873, 878-79 (Bankr. W.D. Mo. 2004) (Dow, J.).

The Trustee in this case alleged generally that Mr. Brown had transferred property of the estate within the year before filing. At trial, the Trustee argued that the concealment of Mr. Brown's interest in the farm as well as the sale of the "odd and ends" of personal property constituted a violation of this subsection. The Court disagrees.

First, with respect to the farm, the undisputed evidence is that Mr. Brown listed an ownership interest in the farm on a January 1, 2008 financial statement, but removed it from later financial statements dated March 2, 2010, and February 1, 2011. The Chapter 7 was filed on November 26, 2012; Mr. Brown testified about why he removed the farm interest from his later financial statements at the § 341 meeting on April 13, 2012. Although the Court does not believe

Mr. Brown's various stories about why he no longer has an interest in the farm (which will be discussed in more detail below), any "concealment" occurred outside the one year-period before the filing of the Chapter 7.  *See, e.g., In re Gordon*, 526 B.R. 376 (B.A.P. 10th Cir. 2015) (discussion of meaning of concealment). With respect to the personal property sold after the Chapter 13 was dismissed (lawn mower, chainsaws, odds and ends), the Court again does not believe Mr. Brown's story (more about that later, too), but believes the evidence falls short of showing that these purported sales were made with the requisite actual intent to hinder, delay, or defraud.

Judgment on this count is entered in favor of Defendant David Earl Brown.

### 11 U.S.C. § 727(a)(2)(B)

11 U.S.C. § 727(a)(2)(B) provides that the court shall grant the debtor a discharge unless the debtor "with intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated or concealed -- property of the estate, after the date of the filing of the petition." The elements of § 727(a)(2)(B) are the same as those under § 727(a)(2)(A), except that the wrongful action must occur post-petition. *See In re Darr*, 472 B.R. 888, 894 (Bankr. E.D. Mo. 2012).

The Court understands that, as of the date the § 727 was set to expire, the Trustee was still unable to fully investigate the loss of estate assets, due to Mr. Brown's evasiveness in answering questions, his failure to produce documents, his invocation of his 5th Amendment privilege, and his general failure to cooperate. Under those circumstances, it was reasonable for the Trustee to include a § 727(a)(2)(B) count in his complaint. The Trustee candidly admitted at

trial that he did not present evidence that Mr. Brown transferred any property of the estate postpetition, and the Court finds none.

Judgment on this count is entered in favor of Defendant David Earl Brown.

### 11 U.S.C. § 727(a)(3)

11 U.S.C. § 727(a)(3) provides that the court shall grant the debtor a discharge, unless "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records and paper, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case."

Under § 727(a)(3), the objecting party carries the initial burden of making a prima facie showing that the records are inadequate, and then the burden shifts to the debtor to show the failure was justified. *In re Gregg*, 510 B.R. 614, 627 (Bankr. W.D. Mo. 2014) (Federman, C.J.); *In re Wolfe*, 232 B.R. 741, 745 (B.A.P. 8th Cir. 1999). There is no intent element involved in evaluating the applicability of this provision, rather, a standard of reasonableness applies. *In re Wolfe*, 232 B.R. at 745.

The debtor must "take such steps as ordinary fair dealing and common caution dictate to enable the creditors to learn what he did with his estate." *In re Wolfe*, 232 B.R. at 745. The court should not deny discharge if "the debtor's records, though poorly organized, are reasonably sufficient to ascertain the debtor's financial condition." *Riley*, 305 B.R. at 883. A "justified" failure to keep records is determined by considering "what records someone in like circumstances to the debtor would keep." *Riley*, 305 B.R. at 883.

The Court considers several factors when considering an alleged § 727(a)(3) violation:

1.  The complexity of the debtor's business;

2.   The customary business practices in the particular industry;

3.   The degree of accuracy of existing records; and

4.   The debtor's courtroom demeanor.

*In re Gregg*, 510 B.R. 614, 626-27 (Bankr. W.D. Mo. 2014) (Federman, C.J.).

The Trustee in this case pled § 727(a)(3) in the alternative with § 727(a)(5) (failure to explain loss of assets). At trial, he argued that Mr. Brown's failure to provide documents that he had requested, either during the § 341 meeting, the Rule 2004 examination, in letters admitted into evidence, or in the motions to compel, constituted a violation of the § 727(a)(3). Those documents included (1) records of the deposit of the $25,000 loan proceeds from Alice Elliott; (2) the ledger of payments to Alice Elliott; (3) documentation regarding credits against the Alice Elliott loan for work performed; (4) a list of the property that the Bank had allegedly inappropriately sold at auction, including a narrative of what happened; and (5) documentation about the $129,200 of assets shown on his financial statements. Mr. Brown, for his part, blamed his failure to provide this information to the Trustee on communication problems with his lawyer, or that it had "slipped his mind," or that the Bank had taken all his records.

Again, the Court does not believe Mr. Brown's excuses for his failure to cooperate and provide requested documentation to the Trustee. Subsection 727(a)(3), however, punishes a failure to "keep or preserve recorded information." The only "recorded information" among the list of requested documents is the deposit records and the ledger Mr. Brown testified he created. The remaining requests involve information to be created. The Trustee cites no legal authority for the proposition that failure to create a narrative, for example, upon the Trustee's admittedly reasonable request for one, triggers a § 727(a)(3) violation. The Trustee does argue that the Court should apply a "totality of circumstances" type test to its § 727 analysis in general, but the

Trustee's legal authorities involve revocation of discharge for fraud under § 727(d). *See, e.g., In re Osborne*, 476 B.R. 284 (Bankr. D. Kan. 2012). The Court finds no legal justification to stretch § 727(a)(3) into a general failure to cooperate or to respond to, in essence,  discovery requests.

It is undisputed that the Alice Elliott loan occurred in September 2001, more than ten years before either the Chapter 13 or Chapter 7 bankruptcy was filed. And, the ledger of payments was ultimately provided by Alice Elliott to the Trustee and shows only six payments in almost twelve years. Although not condoning Mr. Brown's utter failure to assist the Trustee in his duty to investigate the Debtor's assets and financial affairs, under the circumstances, the Court finds that the Trustee has not met his burden of showing that Mr. Brown's records were inadequate within the meaning of 11 U.S.C. § 727(a)(3).

Judgment on this count is entered in favor of Defendant David Earl Brown.

### 11 U.S.C. § 727(a)(4)(A)

11 U.S.C. § 727(a)(4)(A) provides that the court shall grant the debtor a discharge, unless "the debtor knowingly and fraudulently, in or in connection with the case – made a false oath or account."

A "harsh penalty" awaits a debtor who "deliberately secretes information from the court, the trustee, and other parties of interest in his case*." Cepelak v. Sears* (*In re Sears*), 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000)).  A debtor's "knowledge" and "intent" are questions of fact.  A false oath bars discharge when it is both material and made with intent. *Korte*, 262 B.R. at 474. "Materiality" carries a low threshold. *Id.*  A false oath is "material" when it relates to the debtor's "business transactions or estate, or concerns the discovery of assets, business dealings, or the existence or disposition of his property." *Id.*   "Intent" can be established with circumstantial evidence and "statements made with reckless indifference to the truth are regarded

as intentionally false." *Id.* The Code requires the debtor's full and complete disclosure of any interests of any kind and the location of all assets. *Id.*

To prove a violation of § 727(a)(4)(A), the Trustee must prove four elements:

> (1) the debtor knowingly and fraudulently;

> (2) in or in connection with a case;

> (3) made a false oath or account;

> (4) regarding a material matter.

*In re Gregg*, 510 B.R. 614, 621 (Bankr. W.D. Mo. 2014).

In this case, the Trustee alleges that Mr. Brown knowingly and fraudulently (1) failed to schedule assets, including his interest in the farm, his pending workers' compensation claim, the personal property from the shop building; (2) failed to schedule the correct value of his household goods; (3) failed to disclose in his statement of financial affairs sales and transfers of property; and  (4) testified falsely about these things at his § 341 meeting and his Rule 2004 examination. The Court agrees.

### *The Interest In the Farm*

The undisputed evidence showed that David Brown "brokered" a purchase of the farm on behalf of his sister and her husband in 2001 and wrote a $2,500 check to the realtor from his joint personal account. In 2005, Mr. Brown signed a Cash Rent Statement for the benefit of the Grundy County Farm Service Agency as "owner" indicating that he had rented "my/our farm" and that the tenant would receive the program payments for the 2005 year. Mr. Brown claimed a half interest in the farm valued at $124,000 on his 2008 financial statement. Although Mr. Brown invoked the 5th Amendment when asked whether he had signed the financial statement, the Court heard the credible testimony of the Bank officer that the financial statement was Mr. Brown's

38

statement and that the officer recognized Mr. Brown's signature, from which the Court can find as a fact finder that Mr. Brown did indeed sign the January 1, 2008 statement. Further evidence that Mr. Brown signed it comes from his testimony that he later "corrected" the financial statement by removing his interest in the farm.

Mr. Brown testified at trial that although he brokered the loan, the land was not put in his name because his sister did not trust Mr. Brown's wife and did not want his and his wife's name on the deed. He testified that his way of making payments for the land would be to build ponds on the land, but that Alice did not like the idea because it would take some of the land out of the CRP program, and that he had had a falling out with his sister because of it, sometime in the Fall or Winter of 2008 (after he had provided his financial statement to the Bank).

The Court does not believe Mr. Brown's story told at trial. Mr. Brown told a different story to the Chapter 13 Trustee and Mr. Cowherd, saying, "We had paid her back on the note with the understanding that someday when that note was paid off, we might have part of that farm. Or have control of that farm." Other testimony from the meeting states that the money Mr. Brown paid his sister was actually from the $25,000 loan proceeds. Yet Mr. Brown testified at trial that all the $25,000 of the loan proceeds went to pay off his wife's credit card debts. The Court also finds it convenient that when asked by Mr. Cowherd about a *2009* financial statement, a date that was obviously an error, Mr. Brown said nothing about the land being acquired for hunting, or paying Alice back through building ponds, and that he could not remember when the falling out had occurred. Once Mr. Brown realized that the financial statement was dated January 1, 2008, not 2009, however, then suddenly the falling out occurred *after* he presented his financial statement.

The Court is not sure what the true story is about the farm, but is convinced that Mr. Brown had and has a 50% equitable ownership in it, regardless of whether or not the farm was titled in his name. The Court further finds credible the testimony of Gary Constant, the Bank officer, that the Bank discussed taking an interest in the farm as additional collateral to assist Mr. Brown in restructuring his loans, but that Mr. Brown said he could not grant the Bank a deed of trust because the farm wasn't in his name "yet." The Court also believes Mr. Constant's testimony that he had to leave the farm off the next financial statement because he was having difficulties with his wife and did not want her to know about the farm in case of a divorce.

In sum, overwhelming evidence is that Mr. Brown had an interest in the farm; that he knew he had an interest in the farm; that his interest was material and valuable – valuable enough to include on a financial statement – and that he knowingly and fraudulently failed to schedule his interest in the farm in either of his bankruptcy filings. The Court's finding that Mr. Brown's omission was knowing and fraudulent is buttressed by the fact that he attended Judge Venter's hearing when the Judge questioned his omission of the farm interest, and yet still filed another bankruptcy without scheduling it.

### *Pending Workers Compensation Claim*

The evidence is undisputed that Mr. Brown was injured in November 2011 and had a workers' compensation claim pending at the time he filed his Chapter 7 bankruptcy that Mr. Brown did not schedule in his bankruptcy schedules. Although it is true that Mr. Brown's counsel wisely disclosed it to the Trustee at the § 341 meeting; later amended the Schedules B and G to reflect a contract with the workers' compensation attorney; and that an unliquidated workers compensation claim would be exempt if scheduled, the Court nonetheless believes that

Mr. Brown's omission of the workers' compensation claim was knowing and fraudulent and material, for several reasons.

First, Mr. Brown knew from his participation at the § 341 meeting with Mr. Fink in his first bankruptcy case that a debtor is required to list "all assets"; Mr. Fink even directed Mr. Brown to get with his attorney to amend to include an asset that had been omitted, the $13,000 account receivable. And, Mr. Brown has made much of this injury and his inability to be treated for it, as well as his subsequent devastating injury in April 2014 at every turn during this proceeding, referring to it and the pain each time he sought a continuance. It is inconceivable to the Court that someone in as much pain as Mr. Brown claims to be could fail to tell his lawyer about this claim. The only conclusion the Court can draw is that the omission was knowing and fraudulent.

More importantly, the omission is material. Even though an unliquidated workers' compensation claim is exempt under Missouri law,[17] the Trustee had a right to investigate to determine whether Mr. Brown might have a nonexempt cause of action for product liability or other tort arising out of the injury.

Finally, Mr. Brown is an intelligent man, whom the Court was able, as noted above, to observe closely during the trial. The Court does not believe Mr. Brown when he testified at trial that he did not know the workers' compensation claim was "relevant," particularly since Mr. Brown was intelligent enough to retain a lawyer for the claim, and to turn down a $37,000 settlement offer made sometime in the first half of 2012 – obviously during the Chapter 13 and before the Chapter 7 was filed – on the grounds it was not enough to provide appropriate medical treatment for his injuries.

---

[17]    Missouri Rev. Stat. § 287.260.

*Other Omissions*

Mr. Brown has made numerous other false oaths during the course of both his bankruptcies. Although treating the debt to his sister under the plan as being current, he testified initially at the Chapter 13 § 341 meeting that he had not paid his sister back in the year before filing the Chapter 13, and included no payments to insiders in answer to Question 3(b) on his statement of financial affairs. Yet the undisputed evidence is that he paid his sister $500 within the year before Chapter 13 filing, rendering both his testimony and the statement of financial affairs false. Mr. Brown also scheduled the debt to his sister as being $25,000, leading Judge Venters to believe that the Browns had equity the house such that the Browns were spared an immediate conversion to Chapter 7. The failure to ascertain the correct balance was reckless, if not fraudulent.

In addition to omitting the farm interest and workers' compensation claim, Mr. Brown also omitted from his Chapter 13 Schedules the personal property allegedly located in his shop building, including what he testified were some $70,000 to $80,000 of antique tools, a motorcycle and a three-wheeler. The level of detail describing the other vehicles that were scheduled in the Chapter 13 Schedule B makes it inconceivable that Mr. Brown could "forget" to list these titled vehicles. He did not disclose these other assets even though the Chapter 13 Trustee asked him if he had disclosed all assets, and advised him when the Trustee found out about the omitted $13,000 account receivable that he needed to get with his attorney to correct that omission.

Then, after having been advised by the Chapter 13 Trustee and hearing Judge Venter's remarks about disappearing and omitted assets, Mr. Brown filed a Chapter 7, and still made no effort to verify the correct balance of the loan to Alice Elliott; did not disclose the property taken

from the shop building; did not disclose any sales of household goods or other property until asked at the Rule 2004 examination to explain what happened to his $129,200 of personal property; did not disclose gifts to nieces and nephews; did not disclose his collection of the $13,000 accounts receivable; in addition to not disclosing the farm interest or workers' compensation claim. And, his testimony at the Chapter 7 § 341 and the Rule 2004 examination – in marked contrast to his testimony at trial – is evasive, obfuscating, and simply unbelievable (such as when Mr. Brown testified during the Rule 2004 examination that he understood transfers of property to only mean real estate).

Nor does the Court believe Mr. Brown's explanations – that in the Chapter 13, he merely relied on advice of counsel or that the failures were the result of communication difficulties, or his medical difficulties, and that in the Chapter 7, it was a simple "misunderstanding" on his part; that he did not pay enough attention to the schedules but now he understands he has to comply and is willing to amend to now fully disclose, if only the Court will give him that opportunity, since he now realizes he will never work again and needs his discharge. These protestations and proclamations ring hollow, after months and months of the Trustee attempting to pry information out of Mr. Brown.

Nonetheless, the Court believes it cannot deny a discharge to Mr. Brown for his false oaths during the Chapter 13, except within the confines of § 727(a)(7), which only applies to bad acts concerning insiders "in connection with another case" – that section will be discussed below. Rather, § 727(a)(4)(A) applies to false oaths "in or in connection with this case" – meaning the Chapter 7. More importantly, the Chapter 13 § 341 transcript does not contain any recitation that Mr. Brown was sworn in before he testified, and the Court is unwilling to merely

assume Mr. Brown was sworn when the transcript does not contain it and there has been no other evidence that Mr. Brown was sworn before testifying.

As for the other omissions and testimony during the Chapter 7, however, the Court does conclude the Trustee has met his burden. "A debtor acts knowingly if he or she acts deliberately and consciously." *In re Osborne*, 476 B.R. 284, 294 (Bankr. D. Kan. 2012). Mr. Brown admitted that he signed the schedules and statements, and admitted he merely glanced at them. "Such reckless indifference to the truth has consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A)." *Id*. At a minimum, Mr. Brown acted with reckless indifference, if not fraudulently, in omitting assets and transfers from his Chapter 7 schedules and statements.

Finally, with respect to materiality, the Court agrees with Mr. Strauss that an accumulation of small omissions of assets of small values can be material under § 727(a)(4)(A). The Court has already concluded that omission of the farm interest and workers' compensation claim were material. However, omission of the other property was material, too. The Court does not believe Mr. Brown when he says that the personal property he retrieved from the shop building was merely junk; it is not believable that Mr. Brown would call on four or five friends with trucks and trailers and expend the time and effort he did to move the property if he thought it were junk. His explanation that he took it anyway because he knew the Bank would later say they returned valuable assets to him is simply nonsensical. Mr. Brown's trial testimony that he did not understand that the Trustee wanted information about it and that he simply misunderstood because he thought it was junk is belied by the fact that Mr. Brown later amended his schedules and did include values on some of the property.

With respect to the household goods and tools, the Court does not believe that Mr. Brown ever had $129,200 in household goods including $70,000 to $80,000 in antique tools. The Court believes the credible testimony of the very experienced and knowledgeable auctioneer who inspected the items in the building and conducted the sale that there were no antique tools. The Court believes the auctioneer when he testified he had no incentive not to advertise antique tools had indeed there been some, since it would only have attracted more buyers and induced more sales and increased his sales commission. The Court likewise believes the credible testimony of the Bank officer that there were no antique tools. Mr. Brown scheduled the Bank as a creditor with a deficiency balance on its loans of $68,000; the Bank, facing such an uncollectible deficiency, had no incentive to depress the value of items to be sold at auction or otherwise ignore valuable antique tools if they had existed, since the Bank had a blanket lien in all the personal property, including any tools.

If Mr. Brown had truly had a collection of antique tools worth that much money and of great sentimental value, he would have protested the absence of the tools to the auctioneer or the Bank officer[18] (or his lawyer); he would have had pictures of the tools or have had them insured; or would have disclosed the loss of the tools in answer to the question of the statement of financial affairs about losses within the year before filing.

Rather, the Court believes Mr. Brown concocted the story about the tools as a defensive measure to avoid the Bank's potential nondischargeabilty claim for Mr. Brown's submission of a false financial statement. A fair reading of the Rule 2004 examination indicates that when faced with the question of how the household goods could go from a value of $129,200 to $2,250, Mr. Brown could not explain it – that the household goods were never worth $129,200 -- and thus he

---

[18]     The Court believes the credible testimony of the auctioneer and Gary Constant that Mr. Brown never told them he had any antique tools.

came up with the story of antique tools, items given to nieces and nephews, and so on. The Court thus does not believe that there are $36,000 of household assets missing, but, rather, that they never existed. Nonetheless, testifying – falsely – that such assets exists so as to send the Trustee off on a wild goose chase to find assets and tools that never existed is itself a "false account" within the meaning of 11 U.S.C. § 727(a)(4)(A).

In the words of the *Osborne* case, "the Court's examination of the admitted exhibits in this case, review of the dockets in the main case and the adversary case, and familiarity with these proceedings convinces the Court that if [Mr. Brown's] filings had been complete and accurate, or even if [Mr. Brown] had cooperated once the deficiencies were identified, the course of these proceedings would have been smoother and the work of the Trustee significantly reduced. When coupled with [Mr. Brown's] cavalier indifference and his on-going pattern of disdain for full disclosure, the deficiencies in [his] filings required the Trustee to 'engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.'" *In re Osborne*, 476 BR. at 296. Mr. Brown's sudden willingness to apologize, cooperate and amend is simply too late. *See In re Rao*, 2015 WL 860362 (Bankr. E.D. La. Feb. 26, 2015).

In sum, the Court concludes that Mr. Brown's failure to schedule his interest in the farm, his workers' compensation claim, and the other personal property; his failure to disclose transfers of property, along with his false testimony in connection therewith, constitutes a violation of § 727(a)(4)(A); that the Trustee has met his burden of proof and that judgment should be entered in favor of the Trustee and against David Earl Brown.

### 11 U.S.C. § 727(a)(4)(D)

11 U.S.C. § 727(a)(4)(D) provides that the court shall grant the debtor a discharge unless "the debtor knowingly and fraudulently, in or in connection with the case – withheld from an

officer of the estate entitled to possession under this title, any recorded information, including

books, documents, records, and papers, relating to the debtor's property or financial affairs." A

debtor "knowingly and fraudulently withholds records when the failure to produce requested

records is an attempt to hide assets or impede the trustee." *In re Mullin*, 455 B.R. 256, 261

(Bankr. M.D. Fla. 2011).

The Trustee argues that Mr. Brown's failure to turnover the documents discussed in

connection with § 727(a)(3) along with a failure to turnover guns and other nonexempt property

constitutes a violation of  this subsection. The Court reiterates its conclusions with respect to §

727(a)(3); § 727(a)(4)(D) cannot be stretched into a general failure to turnover or cooperate but

rather applies to the withholding of "recorded information." The Trustee has not met his burden

of proof with respect to this count.

Judgment on this count is entered in favor of Defendant David Earl Brown.

### 11 U.S.C. § 727(a)(5)

11 U.S.C. § 727(a)(5) provides that the court shall grant the debtor a discharge, unless

"the debtor has failed to explain satisfactorily, before determination of denial of discharge under

this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."

The party objecting to discharge must first offer some evidence of the disappearance of

assets or unusual transactions, then the debtor must "explain satisfactorily" what happened to the

assets. *Chalik v. Moorefield* (*In re Chalik*), 748 F.2d 616, 619-20 (11th Cir. 1984).  A finding of

"intent" is not required. *Nof v. Gannon* (*In re Gannon*), 173 B.R. 313 (Bankr. S.D.N.Y. 1997).

"Lack of wisdom in the debtor's expenditures, by itself, is not grounds for denial of a discharge."

*Great American Ins. Co. v. Nye* (*In re Nye*), 64 B.R. 759 (Bankr. E.D.N.C. 1986) (explanation

need not be meritorious to be satisfactory).  The debtor's explanation "must amount to more than

a 'vague, indefinite, and uncorroborated hodgepodge of financial transactions . . . and must be definite enough to convince the trial judge that assets are not missing." *In re Darr*, 472 B.R. 888, 900 (Bankr. E.D. Mo. 2012) (cites omitted).

In this case, the Trustee argues that based on Mr. Brown's signed personal financial statement and sworn testimony, thousands of dollars of assets are missing. As noted above, the Court does not believe that $129,200 of assets existed; however, when faced with the evidence that he had signed a financial statement in as recently as February 2011 listing $129,200 in personal property assets, as compared to only $2,250 listed in the Schedule B, the burden shifted to Mr. Brown to "explain satisfactorily" what happened. Mr. Brown failed to do so. At trial, the Trustee asked Mr. Brown about the $126,000 (the $129,200 minus about $3,000 disclosed); Mr. Brown testified that he did not know he had to disclose or account for those assets, and that he had relied entirely on legal advice, and that it was a "communication problem,"[19] even though he now knows he has to comply.

The Court believes this testimony is disingenuous at best. Mr. Brown could not have failed to understand, when asked at the Rule 2004 examination in addition to motions to compel and letters from the Trustee. His answer at trial – that he did not know – was in stark contrast to his evasive answers at the examination. Mr. Brown has still not satisfactorily explained what happened to the $129,200 of assets that he had in his mind when he prepared the financial statement to when he filed the bankruptcy case.

Judgment on this count is entered against in favor of the Trustee and against Defendant David Earl Brown denying his discharge under 11 U.S.C. § 727(a)(5).

---

[19] The Court knows both attorneys who represented Mr. Brown, and does not believe that either attorney would fail to communicate adequately with Mr. Brown, and that any communication problems with his attorneys should rest solely at the feet of Mr. Brown.

### 11 U.S.C. § 727(a)(7)

11 U.S.C. § 727(a)(7) provides that the court shall grant the debtor a discharge unless "the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider."

The Court has already outlined the elements of acts under § 727(a)(2), (a)(3), (a)(4) and (a)(5), and need not repeat them here. In addition to the elements required under those specified paragraphs, the Court must find: (1) an insider relationship exists; and (2) the misconduct must have occurred within 1 year of the filing of the debtor's petition. *In re Kane*, 755 F.3d 1285 (11th Cir. 2014).

In this case, the Trustee contends that Mr. Brown's plan treatment of Alice Elliott's loan as being current; that Mr. Brown's scheduling of only a $25,000 balance to Alice Elliott; that his failure to schedule the farm interest co-owned with Alice Elliott; and his testimony at the Chapter 13 § 341 meeting regarding these matters constituted violations of § 727(a)(4)(A) (false oath) in connection with an insider, his sister, in the previous Chapter 13 case. The Court agrees in part.

It is undisputed that Alice Elliott is Mr. Brown's sister, and therefore is an "insider" within the meaning of § 727(a)(7) and 11 U.S.C. § 101(31)(A)(i). Moreover, Chapter 13 Schedules and Statements containing the false oaths were filed on December 11, 2012, and the § 341 meeting occurred on April 13, 2012, both within the year before Mr. Brown filed this Chapter 7 bankruptcy, on November 26, 2012. However, as noted above, the Court will not consider the testimony at the Chapter 13 § 341 meeting as consisting of a false oath, since there

is no evidence before the Court that Mr. Brown was sworn before he testified. Moreover, the Chapter 13 plan dated February 27, 2012, is neither signed nor sworn by Mr. Brown.

On the other hand, the Court has determined that the failure to schedule the interest in the farm; the failure to schedule the accurate loan balance owed to Alice Elliott; and the failure to disclose the loan repayment made to Alice Elliott within the year before the filing all constitute knowing and fraudulent false oaths regarding material matters within the meaning of § 727(a)(4))A). Other falsehoods include the fact that Mr. Brown testified inconsistently each time he testified on how and why the farm was acquired; whether and how he obtained an interest in the farm; what he did with the $25,000 loan proceeds; whether any of the loan proceeds were used to acquire his interest; whether and when he had paid his sister; when and what was the source of his falling out with Alice Elliott; and even how many loans he had with Alice Elliott.

At trial, for the first time, Mr. Brown testified that there had actually been *two loans* from Alice Elliott. It is shocking to the Court that, over the course of three withering examinations on this subject by three different lawyers, Mr. Brown would have failed to remember that he borrowed money a second time from his sister. Sadly, it is another indication of Mr. Brown's apparent willingness to testify to what seems expedient to him at the time, rather than to the truth. The Court therefore concludes that the Trustee has met his burden of proving a violation of § 727(a)(7).

Judgment on this count is entered in favor of the Trustee and against Defendant David Earl Brown.

### Conclusion

The Court does not lightly deny a debtor a discharge, particularly one who clearly faces some medical problems and may or may not be able to regain the ability to earn a meaningful

livelihood. Nonetheless, Mr. Brown's cavalier disregard for the truth – continued up until the very time he took the stand – when he suddenly professed a new-found regard for the truth – rings hollow with this Court. Mr. Brown failed to take responsibility for his own actions – blaming his attorneys, the Bank, and everyone but himself. The system does not work unless debtors fully and accurately disclose their assets. Mr. Brown failed to do so, and now, unfortunately, must suffer the "harsh penalty" of denial of his discharge.

A separate Judgment denying the discharge of David Earl Brown under 11 U.S.C. §§ 727(a)(4)(A), (a)(5) and (a)(7), will issue.

Dated this 13th day of May, 2015.

/s/ Cynthia A. Norton

UNITED STATES BANKRUPTCY JUDGE